## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DANNY ANDREWS, Derivatively on Behalf of Nominal Defendant INOVIO PHARMACEUTICALS, INC.,

Plaintiff,

v.

JACQUELINE E. SHEA, PETER KIES, SIMON X. BENITO, ROGER D. DANSEY, ANN C. MILLER, JAY P. SHEPARD, DAVID B. WEINER, WENDY L. YARNO, and LOTA S. ZOTH,

Defendants,

and

INOVIO PHARMACEUTICALS, INC.,

Nominal Defendant.

C.A. No.

**JURY TRIAL DEMANDED**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through the undersigned counsel, Plaintiff Danny Andrews ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company") and against certain current and former officers and directors of the Company for violations of section 14(a) of the Exchange Act, contribution under section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act, breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself/herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by

Inovio and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Inovio's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Carlson v. Inovio Pharamceuticals, Inc. et al,* Case No. 2:26-cv-00803 (E.D. Pa. Feb. 6, 2026) (the "Related Securities Action"); and (e) review of other publicly available information concerning Inovio and the Defendants.

## **NATURE OF THE ACTION**

1. Plaintiff brings this action derivatively for the benefit of Nominal Defendant Inovio against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately October 10, 2023, to the present (the "Relevant Period").[1]

2. Inovio is a Delaware corporation based in Plymouth Meeting, Pennsylvania, chiefly engaged as a clinical-stage biotechnology company. The Company's business focuses on the development and commercialization of DNA-based treatments, particularly treatments and preventative care for Human Papillomavirus ("HPV") and associated diseases and cancers, as well as for other infectious diseases.

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately October 10, 2023, to December 26, 2025; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

3.     Inovio's products consist of two categories: (i) DNA plasmids, and (ii) Inovio's proprietary CELLECTRA® devices. The Company's DNA plasmids are designed to induce the desired immune response in patients, and the CELLECTRA® devices are the delivery system for those plasmids.

4.     The Company's lead product candidate is known as INO-3107 and is intended for use as a treatment against recurrent respiratory papillomatosis ("RRP"). Throughout the Relevant Period, the Individual Defendants repeatedly emphasized that the Company was attempting to receive accelerated approval and/or priority review from the U.S. Food and Drug Administration ("FDA") for the Biologics License Application ("BLA") of INO-3107 as a treatment for RRP (the "INO 3107 BLA"). Moreover, during the Relevant Period the Individual Defendants touted that the Company could achieve a rolling submission of the INO-3107 BLA by the second half of 2024. While the Individual Defendants were making these positive representations to the public, the Company conducted multiple public offerings of Inovio's securities leading to millions of dollars worth of profits per offering.

5.     A Biologics License Application ("BLA") is a standard application promulgated and reviewed by the Federal Drug Administration ("FDA") for any entity seeking to introduce a biological product into interstate commerce within the United States. A BLA includes the following components: (i) applicant information; (ii) product/manufacturing information; (iii) preclinical studies; and (iv) labeling.

6.     As described in greater detail herein, Inovio represented to investors throughout the Relevant Period that it intended to make use of the FDA's Accelerated Approval program for BLAs. The main purpose of the Accelerated Approval program is to provide a quicker timeline to approval for drugs treating serious conditions with unmet medical needs. According to the

FDA, by granting approval based on surrogate endpoints, such as laboratory measurements, radiographic images, or physical signs, the Accelerated Approval program can considerably shorten the time required prior to receiving FDA approval. The Company made it known that, if approved, INO-3107 would be the Company's first product to receive regulatory approval and would be the first DNA medicine of its kind in the United States.

7.      On January 3, 2024, Inovio issued a press release announcing the Company's intention to submit a BLA for INO-3107 "in the second half of 2024 and request a Priority Review," wherein Defendant Shea is quoted as saying "[b]ased on productive discussions with the FDA, we believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program," and "[o]ur plan is to complete the submission of our BLA in the second half of 2024 and request a Priority Review."

8.      However, on August 8, 2024, the Company revealed that it would not be able to submit the INO-3107 BLA until mid-2025—a full year after its original planned submission date. In a press release issued that day, Inovio claimed it had "recently identified a manufacturing issue" with a component of INO-3107, which would "take additional time to rectify."

9.      Nevertheless, the Company maintained that this problem was "resolvable," and continued to highlight in its public disclosures that it anticipated the FDA would grant its request for expedited review of the INO-3107 BLA. In March 2025, Inovio announced that it had resolved the manufacturing issue and was "back on track to submitting [its] first BLA for INO-3107 to the FDA." The Company told investors the FDA had "agreed to [its] rolling submission plan" for the BLA in August 2025, and announced that it had "submitted the BLA under the FDA's Accelerated Approval program and [] requested a priority review" in November 2025.

10. The truth fully emerged on December 29, 2025, when Inovio issued a press release announcing that it had not been granted priority review under the FDA's Accelerated Approval program. The Company informed investors that the FDA had preliminarily concluded that the BLA did not contain "adequate information to justify eligibility for the accelerated approval pathway."

11. On this news, the price of the Company's stock fell $0.56 per share, or approximately 24.5%, from a close of $2.29 per share on December 26, 2025, to close at $1.73 per share on December 29, 2025.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

14. Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this district by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

**A.    Plaintiff**

15. Plaintiff is currently, and has continuously been, a holder of Inovio common stock.

**B.    Nominal Defendant**

16.     Nominal Defendant Inovio is incorporated in Delaware and its current principal executive offices are located at 660 West Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania, 19462. The Company's common stock trades on the NASDAQ (the "NASDAQ") under the ticker symbol "INO."

## C.     Defendants

17.     Defendant Jacqueline E. Shea ("Shea") serves as the Chief Executive Officer ("CEO") of Inovio and is a member of the Company's Board of Directors (the "Board"). For the fiscal year of 2025, Shea received $1,587,155 in total compensation.[2] Defendant Shea is named as a defendant in the Related Securities Action.

18.     Defendant Peter Kies ("Kies") has served as the Chief Financial Officer ("CFO") since 2002. For the fiscal year of 2025, Kies received $833,684 in total compensation. Defendant Kies is named as a defendant in the Related Securities Action.

19.     Defendants Shea and Kies are collectively referred to herein as the "Securities Action Defendants."

20.     Defendant Simon X. Benito ("Benito") serves as the Chairman of the Board and has been a member of the Board since 2003. Director Benito is Chair of the Nomination and Corporate Governance Committee and a member of the Audit Committee and Compensation Committee. For the fiscal year of 2025, Benito received $117,500 in total compensation.

21.     Defendant Roger D. Dansey ("Dansey") has been a member of the Board since 2021. Director Dansey is a member of the Nomination and Corporate Governance Committee. For the fiscal year of 2025, Dansey received $72,095 in total compensation.

---

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

22.     Defendant Ann C. Miller ("Miller") has been a member of the Board since 2019. For the fiscal year of 2025, Miller received $91,750 in total compensation.

23.     Defendant Jay Shepard ("Shepard") has been a member of the Board since 2020. Director Shepard is a member of the Audit Committee and Nomination and Corporate Governance Committee. For the fiscal year of 2025, Shepard received $80,000 in total compensation.

24.     Defendant David B. Weiner ("Weiner") has been a member of the Board since 2016. For the fiscal year of 2025, Weiner received $52,500 in total compensation.

25.     Defendant Wendy L. Yarno ("Yarno") has been a member of the Board since 2017. Director Yarno is Chair of the Compensation Committee and a member of the Nomination and Corporate Governance Committee. For the fiscal year of 2025, Yarno received $82,500 in total compensation.

26.     Defendant Lota S. Zoth ("Zoth") has been a member of the Board since 2019. Director Zoth is Chair of the Audit Committee and a member of the Compensation Committee. For the fiscal year of 2025, Zoth received $77,500 in total compensation.

27.     Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth are collectively referred to herein as the "Director Defendants."

28.     The Director Defendants along with the Securities Action Defendants are referred to collectively herein as the "Individual Defendants."

29.     The Individual Defendants along with Inovio are known collectively as the "Defendants."

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers, directors, and/or fiduciaries of Inovio, and because of their ability to control the business and corporate affairs of Inovio, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Inovio in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Inovio and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

31.     Each director and officer of the Company owes to Inovio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

32.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

33.     Pursuant to the Audit Committee Charter of Inovio (adopted as of May 16, 2023)[3], the purpose of the Audit Committee is described as follows:

> The Audit Committee (the "Committee") of the Board of Directors (the "Board") of the Company is a standing committee and is responsible for oversight of all account reporting, financial and internal control practices of the Company and its subsidiaries. The Committee reports to the Board and its primary function is to assist the Board in fulfilling its responsibilities to shareholders related to (a) the oversight of (i) the accounting and financial reporting processes of the Company

---

[3] Available at https://s21.q4cdn.com/283306112/files/doc_document_list/2026/Jun/10/230516-Audit-Committee-Charter-v4-4ac5fe.pdf.

and the audits of the financial statements of the Company; (ii) the integrity of the Company's financial statements; (iii) the effectiveness of the Company's internal control over financial reporting and (iv) the Company's compliance with legal and regulatory requirements; and (b) (i) the appointment, compensation, qualifications, independence and performance of the Company's independent auditors and (ii) the preparation of an audit committee report as required by the Securities and Exchange Commission (the "SEC"). The Committee's function is one of oversight only and shall not relieve the responsibilities of the Company's management for preparing financial statements, which accurately and fairly present the Company's financial results and condition and for establishing and maintaining internal control over financial reporting, or the responsibilities of the Company's independent registered public accounting firm (the "independent auditors") relating to the audit of the Company's financial statements and the effectiveness of internal control over financial reporting, and for reviewing the Company's unaudited financial statements.

The Committee has the authority to retain persons having special competence as necessary to assist the Committee in fulfilling its responsibilities.

The Committee shall review and reassess, at least annually, the adequacy of this charter and recommend to the Board any improvements to this charter that the Committee considers necessary.

34.      Concerning "Financial Statement and Disclosure Matters," the Audit Committee

Charter states:

### *Financial Statement and Disclosure Matters*

(a)      Meet to review and discuss with management and the independent auditors the annual audited financial statements and quarterly financial statements prior to the filing of such financial statements with the SEC, including reviewing the specific disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K. Also, the Committee shall discuss the results of the quarterly reviews and approve the Company's Quarterly Reports on Form 10-Q. The Committee shall also discuss any other matters required to be communicated to the Committee by the independent registered public accountants under the standards of the Public Company Accounting Oversight Board (PCAOB) (United States).

(b)      Discuss with management and the independent auditors any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements and any major issues regarding accounting principles and financial statement presentations, including any

significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps audit adopted or which need to be adopted in light of material control deficiencies.

(c)    Effect or cause to be effected any revisions to the Company's financial statements which the Committee deems necessary or advisable after consultation with the Company's independent auditors or the Committee's advisors.

(d)    Prior to the filing of Form 10-Q and Form 10-K, review and discuss quarterly and annual reports from the independent auditors on:

(i)    All critical accounting policies and practices to be used, including discussion with the independent auditors any accounting adjustments that were noted or proposed by the Auditors but were "passed" (as immaterial or otherwise).

(ii)    All alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors.

(iii)    Other material written communications between the independent auditors and management such as any management letter or schedule or unadjusted differences.

(e)    Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

(f)    Discuss with management and the independent auditors the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

(g)    Discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 16 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

(h)    Review and discuss annually with management its assessment of the effectiveness of the Company's internal control over financial reporting and

disclosure controls and procedures under Section 404 of the Sarbanes-Oxley Act of 2002 and the rules and regulations thereunder, including:

(i)    Review annually with the independent auditors their opinion and report on the effectiveness of the Company's internal control over financial reporting; and

(ii)    Consider whether any changes to the internal control over financial reporting or disclosure controls and procedures are appropriate in light of management's assessment or the independent auditors' report.

(i)    Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls. Discuss with management the related remediation plan of any significant deficiencies or material weaknesses.

(j)    Review the Company's procedures for monitoring compliance with the Foreign Corrupt Practices Act and other applicable anti-corruption laws.

(k)    Oversee the Company's finance function, which may include the annual review of the Company's investment policy.

(l)    Meet separately and periodically with management of the Company, the employees of the Company responsible for the internal audit and the Company's independent auditors.

(m)    Review and approve all related party transactions required to be disclosed pursuant to SEC Regulation S-K, Item 404, and discuss with management the business rationale for the transactions and whether appropriate disclosures have been made.

(n)    Discuss with management, the internal auditors, and the independent registered public accountants any (1) changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed and (2) any other changes in internal control over financial reporting that were considered for disclosure in the Company's period filings with the SEC.

(o)    Inquire of financial management and the independent auditors regarding the Company's significant financial risk exposures, including its anti-fraud programs and controls, and assess the steps management has taken to minimize and control such risks.

(p)    Periodically review and evaluate the Company's other risk assessment and risk management policies and programs, including but not limited to the Company's policies and programs for identifying and addressing cybersecurity risks.

35.    Concerning "Compliance Oversight Responsibilities," the Audit Committee Charter states:

### *Compliance Oversight Responsibilities*

(a)    Obtain from the independent auditors assurance that Section 10A(b) of the Exchange Act, which addresses the discovery and disclosure of any illegal act, has not been implicated.

(b)    Obtain reports from management, the Company's senior internal auditing executive and the independent auditors that such persons are in compliance with applicable legal requirements and the Company's Code of Business Conduct and Ethics. Such reports shall also confirm that, to such person's knowledge, the Company and its subsidiary and affiliated entities are in conformity with applicable legal requirements and the Company's Code of Business Conduct and Ethics. Review reports and disclosures of insider and affiliated party transactions or other conflicts of interest. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Ethics, including the consideration of a waiver in the Code of Business Conduct and Ethics.

(c)    Establish, review, and, as necessary, update procedures for the receipt, retention and treatment of complaints received by the Company from employees of the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of or advisors to the Company of concerns regarding questionable accounting or auditing matters (i.e., the Company's whistleblower program).

(d)    Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

(e)    Discuss quarterly in separate sessions with the Company's General Counsel and outside counsel legal matters that may have a material impact on the financial statements, or the Company's compliance policies.

(f)    Evaluate complaints received by the Company from employees of the Company regarding accounting, internal accounting controls or auditing matters, and any confidential, anonymous submissions by employees of or advisors to the Company of concerns regarding questionable accounting or auditing matters, and where deemed necessary and appropriate, initiate investigation into such matters, either by the Committee, via formation of a special committee, via recommendation to the Board of Directors for formation of a special committee, or through the engagement of a third party to conduct an independent investigation.

(g)    The Committee will receive, review and discuss with the Company's General Counsel attorneys' reports of evidence of material violations of securities laws and breaches of fiduciary duty and similar violations of U.S., state or other applicable law.

(h)    The Committee will investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

36.    Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

## Duties Pursuant to the Company's Code of Conduct

37.    The Individual Defendants, as officers and/or directors of Inovio, were also bound by the Company's Code of Business Conduct And Ethics (the "Code")[4] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Inovio, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

38.    The Code states the following:

---

[4] Available at https://s21.q4cdn.com/283306112/files/doc_document_list/2026/Jun/10/230516-Code-of-Business-Conduct-and-Ethics-v5-1175de.pdf.

As a publicly traded U.S.-based company in a highly regulated industry that operates globally, the Company's conduct is subject to many laws, rules, and regulations. The Company requires all employees – regardless of job, title, or function – to comply with all laws, rules, and regulations applicable to the Company wherever it does business. Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built.

In addition to strictly complying with all laws, rules, and regulations, you are also expected to know, understand, and comply with this Code. This Code outlines the company's position on the respective areas presented and serves as a roadmap for you to act in an ethical manner. If you are ever uncertain about a course of conduct or encounter a potential issue, please be sure to review this Code, the relevant Employee Handbook for your location, and any department-specific procedures or guidances.

39.    Concerning "Financial Reporting and Controls," the Code states:

The Company requires honest and accurate recording and reporting of financial and other information in order to make responsible business decisions and full, fair, accurate, timely, and understandable financial and other disclosures to regulatory agencies and the public. The Company will maintain internal controls to ensure that transactions are properly authorized, assets are safeguarded, operations are conducted in accordance with Board of Directors and management directives and financial records are reliable. All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal control.

The Company will maintain disclosure controls to ensure that required information is recorded, processed, summarized, and reported as required by law and regulation and within the time periods specified. Required information will be timely communicated to management as appropriate to allow timely decisions regarding disclosure. Financial statements for external purposes will be fairly presented in conformity with generally accepted accounting principles accepted in the United States or other applicable standards as required by law or regulation. Public statements and filings regarding the Company's business and financial status must be true, accurate, complete, timely, understandable, and not misleading. Unrecorded or "off the books" funds or assets will not be maintained unless permitted by applicable law or regulation. No false or fictitious entries may be made on the Company books and records.

If you are uncertain whether a specific expense or transaction is legitimate, you should ask your supervisor or the Finance Department. If you have reason to suspect inaccurate financial reporting, contact the Legal Department, the Audit Committee of the Board of Directors, or the reporting hotline.

40.    Concerning "Conflicts of Interest," the Code states:

A conflict of interest exists when the private interest of an employee interferes with that person's ability to advance the legitimate interests of the Company. A conflict of interest can arise when you take actions or have interests that may make it difficult to perform your Company duties objectively and effectively. Conflicts of interest may also arise when you, or members of your family, receive improper personal benefits as a result of your position with the Company. Know a potential conflict when you see one. A conflict can happen, for example, when:

- You supervise or conduct business with someone with whom you have a close personal relationship.

- You invest in one of our suppliers, customers, business partners, or competitors.

- You own or do work for a company that competes, does business, or wants to do business with INOVIO. Serving in an advisory role or on the board of directors for such a company can also pose a conflict.

- You use the INOVIO name or our property or information, without approval, to support a charitable, professional, or community organization.

- You take for yourself a business opportunity that is meant for INOVIO, even if you think INOVIO would not want the opportunity.

Your supervisor, in consultation with the Legal Department, will take such actions as are necessary and proper to remove the conflict, which may include procedural safeguards, removal of an employee's discretion in the area of conflict, reassignment of job responsibilities, reassignment of the employee, or prohibition against continued participation in the conflicting activity. The resolution of a potential conflict situation is not a violation or waiver of this Code. A waiver may be given only in accordance with the procedures outlined in this Code.

The best policy is to avoid engaging in a transaction or a relationship that may reasonably be expected to give rise to a conflict of interest. In addition, the Company closely follows the "Related Persons" requirements as defined and outlined in SEC regulations as more fully set forth in the Company's Related Persons Transactions Policy. It isn't possible to list every situation that could present a conflict, and conflicts of interest may not always be clear-cut. So, if you become aware of a potential, apparent, or actual conflict, are unsure whether a conflict exists, or for any questions on whether a transaction is one with a "Related Person," seek guidance from the Legal Department.

41.    Concerning "Protection and Proper Use of Company Assets," the Code states:

You must protect the Company's assets and ensure their efficient and lawful use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Any suspected incident of fraud, theft, or improper use of Company assets should be immediately reported to your supervisor, the Legal Department, or via the reporting hotline.

Company equipment, including communications and computer equipment, goods, and services should not be used for non-Company business. Incidental personal use is permissible, but must remain reasonable, limited, appropriate and ethical, and not affect business transactions or your productivity. Using Company assets or information for personal gain is prohibited.

All transactions must be properly authorized. You must be aware of the limits of your authority, and you may not engage in transactions that are beyond the limit of your authority.

42.     Concerning "Careful Communication," the Code states:

Business records and communications often become public, and you should avoid exaggeration, humor or sarcasm, derogatory remarks, guesswork, or inappropriate characterizations of people and companies. Seemingly harmless statements can be misconstrued when reviewed by government regulators, adversaries in litigation, or courts. This guidance applies equally to e-mail, internal memos and formal reports. Company business and communications should only be conducted on the INOVIO Network. You should not use your personal email addresses to conduct Company business or to send, transmit, or receive Company information without prior approval from the IT Department. Anything written, sent, downloaded, or stored on INOVIO's systems is Company property. The Company reserves the right to monitor email and voice mail messages and Internet use, and to access and inspect any and all files stored on individual computers, removable media, and the Company network. User IDs and passwords are to be used for security and employee identification and authentication only and do not grant any right of confidentiality or privacy to any employee, nor prevent Company access.

43.     Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inovio, were able to, and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Inovio.

45.    Because of their advisory, executive, managerial, and directorial positions with Inovio, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Inovio.

46.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Inovio and was at all times acting within the course and scope of such agency.

<b>Reasonable and Prudent Supervision</b>

47.    To discharge their duties, the officers and directors of Inovio were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Inovio were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Inovio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Inovio was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## **BREACHES OF DUTIES**

48.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Inovio and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Inovio, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Inovio, the absence of good faith on their part, and a reckless disregard for their duties to Inovio and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Inovio.

49.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

50.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Inovio has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

53.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

56.     Inovio is a biotechnology company focused on the discovery, development, and commercialization of DNA medicines to treat and protect people from diseases associated with HPV, cancer, and infectious diseases. The Company's DNA medicines are comprised of two components: (i) DNA plasmids, which are small circular DNA molecules that purportedly work like software that the body's cells can download to produce specific proteins to target and fight disease; and (ii) its proprietary investigational medical device, "CELLECTRA," which it uses to help its DNA medicines enter the body's cells for purported optimal effect.

57.     Inovio's lead product candidate is INO-3107 for the treatment of RRP, a life-long, rare disease of the respiratory tract caused by HPV infection. At all relevant times, Defendants touted the prospects of the FDA granting accelerated approval and/or priority review for the INO 3107 BLA. Defendants also touted their ability to complete rolling submission of the INO-3107 BLA by the second half of 2024.

58.     Under the FDA's accelerated approval procedures, the agency allows drugs for serious conditions that fill an unmet medical need to be approved based on a surrogate endpoint— that is, a marker such as a laboratory measurement, radiographic image, physical sign, or other measure that is thought to predict clinical benefit, but is not itself a measure of clinical benefit. The FDA's priority review designation, meanwhile, means the agency's goal is to take action on an application within six months as opposed to the tenth-month standard review

timeline. This designation is afforded to drug applications that, if approved, would be significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications.

59.     Accordingly, in repeatedly and consistently touting the INO-3107 BLA's prospects for accelerated approval and/or priority review, Defendants indicated to investors that Inovio was rapidly approaching its transition into a commercial-stage company—one with a lead product asset that, once approved, would fill an unmet medical need and significantly improve the safety or effectiveness of current RRP treatments. The commercial implications of this prospect, which Defendants highlighted throughout the Relevant Period, were of the upmost importance to investors and analysts, and formed a core part of the Company's overall investment thesis.

## Materially False and/or Misleading Statements

60.     The Relevant Period begins on October 10, 2023, when Inovio issued a press release during pre-market hours, touting the anticipated INO-3107 BLA's prospects for accelerated approval. Specifically, the press release stated, in relevant part:

> INOVIO . . . has received feedback from the [FDA] that data from its completed Phase 1/2 trial of INO-3107 for the treatment of RRP could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program. The FDA also advised that the company's previously planned Phase 3 randomized, placebo-controlled trial would not be required to support this submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements . . . . If approved, INO-3107 would be the first DNA medicine in the United States and the first INOVIO candidate to receive regulatory approval.

61.     The same press release quoted Defendant Shea as touting Inovio's "focus[] on streamlining our development plan to support submission of a BLA for accelerated approval."

62.    On November 9, 2023, Inovio issued a press release reporting its financial results and operational highlights for the third quarter ("Q3") of 2023. The press release highlighted that Inovio had *"[r]eceived FDA feedback that data from [a] completed Phase 1/2 trial could be used to submit a [BLA] under [the] Accelerated Approval program*" and was "*[a]ccelerating [its] commercialization strategy in preparation for an earlier launch*" (emphases in original).

63.    The press release likewise stated, *inter alia*:

The FDA advised that completion of a Phase 3 trial would not be required to support the BLA] submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements. Subsequent to this feedback, INOVIO has been focused on preparing to file its BLA under the accelerated approval program. The company anticipates additional meetings with the FDA to finalize next steps, including an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting, or Type B meeting, which it has requested to be held in the fourth quarter of 2023. INOVIO plans to pursue other benefits offered by Breakthrough Therapy designation to quickly resolve any future questions, as well as take advantage of the opportunity to submit under the FDA's Rolling Review program and request a Priority Review once the BLA is fully submitted.

64.    In addition, the press release quoted Defendant Shea as stating, in relevant part:

Following Breakthrough Therapy designation from the FDA in September and subsequent feedback that we no longer need to complete a Phase 3 trial prior to submitting a BLA under the accelerated approval program, our team is laser focused on next steps. These steps include holding an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting with the FDA in the near future to confirm alignment on our accelerated development plans and to clarify timing associated with potentially making INO-3107 available to patients suffering from this devastating disease.

65.    Also on November 9, 2023, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2023 (the "Q3 2023 10-Q"). The Q3 2023 10-Q reiterated that "data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a . . . BLA[] for review under the FDA's accelerated approval program[,]" and that "[t]he FDA

also advised that we will no longer be required to conduct our previously planned Phase 3 randomized, placebo-controlled trial[.]"

66.    Notwithstanding the foregoing, the Q3 2023 10-Q purported to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same, stating, in relevant part[5]:

We plan to pursue accelerated approval for our product candidate INO-3107[.]

\*        \*        \*

*If we pursue accelerated approval for INO-3107 for the treatment or [sic] RRP . . . we would do so on the basis that there is no available therapy for that disease or condition or that our product candidate provides a benefit over available therapy.* If standard of care were to evolve or if any of our competitors were to receive full approval on the basis of a confirmatory trial for a drug or biologic for a disease or condition for which we are seeking accelerated approval before we receive accelerated approval, the disease or condition would no longer qualify as one for which there is no available therapy, and accelerated approval of our product candidate would not occur without a showing of benefit over available therapy. The treatment landscape can change quickly as the FDA converts accelerated approvals to full approvals on the basis of successful confirmatory trials.

*We have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program*; however, whether any trial is sufficient to receive FDA approval under the accelerated approval pathway will depend on the safety and efficacy results of such trial and will only be determined by the FDA upon review of a submitted BLA.

\*        \*        \*

In addition, the FDA may terminate the accelerated approval program or change the standards under which accelerated approvals are considered and granted in response to public pressure or other concerns regarding the accelerated approval program. Changes to or termination of the accelerated approval program could prevent or limit our ability to obtain accelerated approval of any of our clinical development programs.

---

[5] All emphases herein are added unless otherwise indicated.

67.     Appended as exhibits to the Q3 2023 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified, in relevant part, that the Q3 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

68.     On January 3, 2024, Inovio issued a press release announcing that it "***plans to submit a BLA for INO-3107 as a potential treatment for [RRP] in the second half of 2024***" "***follow[ing] an Initial Comprehensive Multidisciplinary Breakthrough Therapy (Type B) Meeting with the FDA on critical aspects of the data package required to submit a BLA under the agency's accelerated approval program***." These statements clearly indicated to investors that Defendants had not only reached alignment with the FDA on the requirements for securing the INO-3107 BLA's accelerated approval, but that they could submit an accelerated approval qualifying BLA for INO-3107 by the second half of 2024.

69.     Indeed, the same press release quoted Defendant Shea as touting that, "***[b]ased on productive discussions with the FDA, we believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program***," and that "***[o]ur plan is to complete the submission of our BLA in the second half of 2024*** and request a Priority Review."

70.     On March 6, 2024, Inovio issued a press release reporting its financial results and operational highlights for the fourth quarter ("Q4") and full year ("FY") of 2023. The press release quoted Defendant Shea as stating, in relevant part:

> In the past year we have taken our lead candidate, INO-3107 for RRP, from positive Phase 1/2 trial results to Breakthrough Therapy designation and ***an established path to BLA submission under the FDA's accelerated approval program*** . . . . The year ahead will provide a critical opportunity to carry this

positive momentum forward across our pipeline, particularly for INO3107 as we prepare for BLA submission and the initiation of a confirmatory trial *in the second half of 2024* and accelerate commercialization efforts *for a potential 2025 launch*.

71.     The same day, Inovio filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2023 (the "2023 10-K"). The 2023 10-K assured investors of the quality and integrity of its manufactured CELLECTRA devices, stating, inter alia, that these "devices have been designed to optimize delivery of our DNA medicine candidates depending on the target disease" and "*are validated and manufactured under Current Good Manufacturing Practices (cGMP)*."

72.     With more general respect to Inovio's commercialization and manufacturing efforts, the 2023 10-K stated, in relevant part:

In 2023, we began accelerating the development of our commercialization plans for INO-3107 in the United States following notice from the FDA that the data from our completed Phase 1/2 trial in patients with RRP could be used to submit a BLA under the accelerated approval program.

We believe our plasmids can be produced in commercial quantities through uniform methods of fermentation and processing that are applicable to all plasmids. We believe we will be able to obtain sufficient supplies of plasmids for all foreseeable clinical investigations.

73.     The 2023 10-K also contained the same generic, boilerplate provisions as referenced herein, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "*if*" certain conditions occurred, while simultaneously downplaying the same.

74.     Appended as exhibits to the 2023 10-K were substantively the same SOX certifications as referenced herein, *supra*, signed by the Individual Defendants.

75.     On April 18, 2024, Inovio closed an underwritten registered direct offering (the "April 2024 Offering") of 2,536,258 shares of its common stock at an offering price of $7.693

per share, as well as pre-funded warrants to purchase 2,135,477 shares of its common stock at an offering price of $7.692 per pre-funded warrant, reaping approximately $33.2 million in net proceeds after underwriting discounts and commissions and estimated offering expenses.

76.    On May 13, 2024, Inovio issued a press release reporting its financial results and recent business highlights for the first quarter ("Q1") of 2024. With respect to the INO-3107 BLA and the Company's commercial preparations to manufacture INO-3107, the press release stated, *inter alia*:

> ***INOVIO remains on target to submit its BLA seeking accelerated approval for INO-3107 in the second half of 2024***. INOVIO is preparing trial sites for recruitment based on recent feedback from the FDA that they had no additional comments on INOVIO's proposed design for the confirmatory trial. The trial is being strategically designed to focus on evaluating clinical benefit in reducing surgical intervention to control RRP disease for the majority of RRP patients. Repeat surgical interventions is the current standard of care for RRP. INOVIO's market research to date with patients and healthcare professionals indicates that a reduction of even one surgery matters, because every surgery poses a significant risk of causing permanent damage to the vocal cords.
>
> \*    \*    \*
>
> ***INOVIO continues preparations to be ready to launch commercially in 2025***, should INO-3107 be approved. Efforts are focused on building the infrastructure needed to deliver the product to patients as quickly and easily as possible, from distribution and supply efforts to payer and healthcare provider support. INOVIO believes that ***INO-3107, if approved, has the potential to be the preferred treatment of choice for all patients with RRP, as well as healthcare professionals and payers based on results from completed clinical trials and the competitive strengths of the DNA medicine platform[.]***

77.    Further, the press release quoted Defendant Shea as stating, in relevant part:

> In the first quarter of 2024, we continued to deliver on our priorities for the year. ***Of utmost importance, we remain on track to submit our BLA in the second half of 2024 under the accelerated approval pathway for INO-3107 as a treatment for RRP*** and are working to initiate our confirmatory trial as soon as possible based on feedback from the FDA on the trial's design. We are energized by the opportunity to potentially deliver the first FDA-approved therapy for this devastating disease and continue to work expeditiously to be prepared to serve RRP patients and the physicians caring for them. If approved, INO-3107 would

also be the first DNA medicine on the market in the United States, representing a major milestone for our technology platform[.]

78.     Also on May 13, 2024, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q stated, inter alia, that "[w]e have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program[,]" and that "[a]s part of submitting our BLA under the accelerated program, *which we plan to do in the second half of 2024*, we will need to satisfy all FDA filing requirements and initiate a confirmatory clinical trial prior to BLA submission."

79.     The Q1 2024 10-Q also contained the same generic, boilerplate provisions as referenced herein, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

80.     Appended as exhibits to the Q1 2024 10-Q were substantively the same SOX certifications as referenced herein, *supra*, signed by the Individual Defendants.

81.     The statements referenced herein above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) manufacturing for Inovio's CELLECTRA device was deficient; (ii) accordingly, Inovio was unlikely to submit the INO-3107 BLA to the FDA by the second half of 2024; (iii) Inovio had insufficient information to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (iv) accordingly, INO-3107's overall regulatory and commercial prospects

were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

82.     In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Inovio to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants failed to disclose that there were issues with manufacturing Inovio's CELLECTRA device. Defendants likewise failed to disclose, *inter alia*, that they lacked sufficient data to support the INO-3107 BLA's accelerated approval or priority review by the FDA. Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

### The Truth Begins to Emerge

83.     The truth began to emerge on August 8, 2024, when, during post-market hours, Inovio issued a press release reporting its financial results and recent business highlights for Q2 2024 (the "Q2 2024 Earnings Release"). Therein, Defendants revealed that Inovio expected to submit the INO-3107 BLA to the FDA in mid-2025—representing an approximate full-year delay from Defendants' initially projected mid-2024 submission timeline—because of "a manufacturing issue" with a component of the CELLECTRA device. The press release quoted Defendant Shea as stating, in relevant part:

> We continue to make progress with our lead candidate, INO-3107, which has the potential to significantly improve the lives of patients with RRP. ***We expect all non-device related elements of our BLA package to be completed by year end*** and our pre-BLA meeting last week with the FDA provided us with confidence that we remain on the right track for the regulatory submission. However, as part of the testing process required for BLA submission, ***we've recently identified a***

*manufacturing issue with the single use disposable administration component of our device that we believe is resolvable, but will take additional time to rectify . . . . We're taking corrective steps to address the issue, and . . . we now expect to be able to submit the BLA in mid-2025.*

84. The same day, also during post-market hours, Inovio held a conference call with investors and analysts to discuss its financial and operating results for Q2 2024 (the "Q2 2024 Earnings Call"). During the call, Inovio's Chief Medical Officer, Michael Sumner, provided further details regarding the manufacturing issue with the CELLECTRA device, stating, *inter alia*:

> [W]e have unfortunately run into a manufacturing issue with a component of our CELLECTRA device. The single-use disposable administration component, otherwise known as the array. This is used to inject the DNA medicine and administer the electroporation. The issue stems from one of the plastic molded parts within this array and was identified during routine testing to support our BLA filing.
>
> *       *       *
>
> Our device teams with the support of our external component manufacturers are working to rapidly address the issue and then repeat the required testing for the array. The additional time needed for completing this work and testing has extended our anticipated timeline for BLA submission to mid-2025.

85. Following the Q2 2024 Earnings Release and Call, Inovio's stock price fell $0.27 per share, or 3.1%, to close at $8.44 per share on August 9, 2024, and at least two analysts cut their price targets ("PT") on Inovio's stock. Specifically, on August 9, 2024, H.C. Wainwright & Co. ("H.C. Wainwright") cut its PT on Inovio stock to $12.00 from $15.00, stating that, "[i]mportantly, management noted that the [BLA] submission for INO-3107 is delayed to mid-2025 due to a manufacturing issue with the single use disposable administration component of the device." Likewise, on August 12, 2024, Oppenheimer cut its PT on Inovio stock to $33.00 from $40.00, noting that, "[w]hile the manufacturing] issue has no impact on the safety or efficacy of the device, it will delay the INO-3107 BLA submission."

86.    Despite the August 9, 2024 decline in Inovio's stock, the Company's securities continued trading at artificially inflated prices throughout the remainder of the Relevant Period because of Defendants' continued misstatements and omissions regarding, inter alia, the INO 3107 BLA's actual prospects for FDA accelerated approval or priority review.

87.    For example, also on August 8, 2024, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q contained the same generic, boilerplate provisions as referenced herein, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

88.    Appended as exhibits to the Q2 2024 10-Q were substantively the same SOX certifications as referenced herein, *supra*, signed by the Individual Defendants.

89.    On November 14, 2024, Inovio issued a press release reporting its financial results and recent business highlights for Q3 2024. The press release quoted Defendant Shea as touting INO-3107's purportedly demonstrated ability to meet an unmet medical need and/or significantly improve the safety or effectiveness of current RRP treatments, thereby indicating to investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review:

> Our development of INO-3107 is supported by a growing body of research that collectively points to INO-3107's potential to be an important therapeutic option for all RRP patients regardless of the severity of their disease. We recently presented new immunology data highlighting the ability of INO-3107 to induce new populations of T cells that travel to the airway tissue and papilloma and correspond with clinical benefit. We've also presented our full safety and efficacy data, demonstrating that INO-3107 was shown to be well tolerated and have clinical benefit in the Phase 1/2 trial. Additionally, by the end of year, we anticipate announcing long-term clinical durability data. We continue to believe

INO-3107 has the potential to become the preferred choice for the broadest number of RRP patients, healthcare providers and payors, if approved.

90.     The same day, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q contained the same generic, boilerplate provisions as referenced herein, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "*if*" certain conditions occurred, while simultaneously downplaying the same.

91.     Appended as exhibits to the Q3 2024 10-Q were substantively the same SOX certifications as referenced herein, *supra*, signed by the Individual Defendants.

92.     On December 16, 2024, Inovio closed an underwritten public offering (the "December 2024 Offering") of 10,000,000 shares of its common stock, as well as accompanying warrants to purchase 10,000,000 shares of its common stock, at an offering price of $3.00 per share and accompanying warrant, reaping approximately $27.6 million in net proceeds after underwriting discounts and commissions and offering expenses.

93.     On January 9, 2025, Inovio issued a press release "highlight[ing] anticipated milestones for 2025 and key accomplishments from 2024 in advance of upcoming investor meetings." The press release touted Inovio's general preparedness to submit the INO-3107 BLA to the FDA with information sufficient to warrant the agency's accelerated approval or priority review, stating, *inter alia*:

**INO-3107**

Anticipated Milestones for 2025

- Submit BLA to the [FDA] by mid-2025 and request priority review. INO-3107 could be the preferred non-surgical therapeutic option for [RRP] and

would be the first DNA medicine approved for any indication in the United States, should it be approved.

- o Resolution of previously announced single-use array manufacturing issue expected by February 2025. Next steps following resolution include completion of retesting process for the CELLECTRA® device and finalization of the device sections of the Chemistry, Manufacturing and Controls (CMC) module, which will be used to update the active Investigational New Drug (IND) Application for the confirmatory trial as well as the BLA submission.

*      *      *

- Submit a redosing study protocol to the FDA.
  - o Recently announced durability data support rationale for redosing patients with goal to maintain or improve clinical benefit.

- Present and publish recently announced durability data and immunology data, as well as the full efficacy and tolerability data from completed Phase 1/2 clinical trial, in a peer-reviewed scientific journal.

94.     On February 12, 2025, Inovio issued a press release highlighting data from its Phase 1/2 clinical trial of INO-3107 as a treatment for RRP, which purportedly supported INO-3107's ability to meet an unmet medical need and/or significantly improve the safety or effectiveness of current RRP treatments, stating, *inter alia*:

> In the trial, treatment with INO-3107 induced new populations of T cells in the blood that traveled to the airway and papilloma tissue and were correlated with a reduction in the number of post-treatment surgeries. Of the 32 patients in the trial, 26 patients (81%) required fewer surgeries post-treatment when compared to the year prior to treatment. INO-3107 treatment was also well tolerated in the trial. INOVIO plans to submit its [BLA] for INO-3107 in mid-2025 and request rolling submission and priority review under the FDA's accelerated approval program. If approved, INO-3107 would be the first DNA medicine approved for any indication in the United States.

95.     The press release also quoted Defendant Shea as touting INO-3107's purportedly demonstrated ability to meet an unmet medical need and/or significantly improve the safety or effectiveness of current RRP treatments, thereby further indicating to investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review:

These important data characterizing the cytotoxic T cell-based mechanism of action of INO-3107, in conjunction with our recently reported durability data showing that clinical benefit continued to improve through year two and into year three after initial treatment, with half of patients not requiring any surgeries in year two, are *part of the growing body of evidence that INO-3107 has the potential to be the preferred product of choice for both patients and healthcare providers* . . . . The primary goal for RRP patients is to reduce or eliminate the need for surgery and INO-3107 has the potential to do just that for the majority of patients. Every surgery matters and a safe and effective therapeutic alternative to surgery would be truly life-changing for RRP patients and their caregivers.

96.    On March 18, 2025, Inovio issued a press release reporting its financial results and operational highlights for Q4 and FY 2024. The press release quoted Defendant Shea as stating, in relevant part:

INOVIO's recent progress puts us on the cusp of achieving several long-term goals for our DNA medicines, most importantly the submission of our first BLA and potential transition to a commercial-stage company . . . . By resolving the previously announced device array component issue, we are back on track to submitting our first BLA for INO-3107 to the FDA. We anticipate starting our submission in mid-2025 with non-device related modules under the agency's rolling submission program, assuming it is granted, with the goal of having the complete submission accepted for priority review before the end of the year. *We continue to believe that INO-3107 has the potential to be the preferred product candidate offering durable clinical benefit, tolerability and a patient-centric dosing regimen and are moving forward with urgency.*

97.    The same day, Inovio filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K stated, *inter alia*, that "[i]n 2024, we continued to advance the development of our commercialization plans for INO-3107 in the United States based on the notification from the FDA that the data from our completed Phase 1/2 trial (RRP-001) could be used to submit a BLA under the FDA's accelerated approval program[,]" and that "[w]e resolved the manufacturing issue in the first quarter of 2025 and are currently on track to begin a rolling submission of the BLA in mid-2025 and to request priority review[.]"

98.    The 2024 10-K also contained the same generic, boilerplate provisions as referenced herein, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

99.    Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced herein, *supra*, signed by the Individual Defendants.

100.    On May 13, 2025, Inovio issued a press release reporting its financial results and recent business highlights for Q1 2025. This press release, too, contained various statements touting INO-3107's purportedly demonstrated ability to meet an unmet medical need and/or significantly improve the safety or effectiveness of current RRP treatments, thereby indicating to investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review. For example, the press release stated, *inter alia*:

- *Clinical and immunological results from Phase 1/2 trial of INO-3107 published in Nature Communications in February 2025*
  - *INO-3107 induced new populations of T cells in the blood that traveled to airway tissue and were associated with significant clinical benefit as measured by reduced need for surgery*

\*      \*      \*

INOVIO plans to begin rolling submission of the BLA in mid-2025 under FDA's accelerated approval program, subject to FDA concurrence, with the goal of completing the submission in the second half of 2025 and receiving FDA acceptance of the submission by the end of the year. FDA has previously awarded breakthrough therapy designation for INO-3107 and INOVIO plans to request priority review of its BLA, which if granted would allow for an FDA approval decision (PDUFA date) in mid-2026.

(Emphases in original.)

101.    The press release also quoted Defendant Shea as stating, in relevant part:

As previously stated, our goal is to begin rolling submission in mid-2025, complete the submission in the second half of 2025 and receive file acceptance from the FDA by year end. If we receive priority review, it could allow for a

PDUFA date in mid 2026 . . . . ***Based on market research, we believe INO-3107 could be the preferred product for patients and providers***, if approved.

102.    Also on May 13, 2025, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q contained substantively the same generic, boilerplate provisions as referenced herein, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "***if***" certain conditions occurred, while simultaneously downplaying the same.

103.    Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced herein, *supra*, signed by the Individual Defendants.

104.    On July 7, 2025, Inovio closed an underwritten public offering (the "July 2025 Offering") of 14,285,715 shares of its common stock and accompanying Series A warrants to purchase up to 14,285,715 shares of its common stock (or pre-funded warrants in lieu thereof) at an exercise price of $1.75 per share of common stock, as well as Series B warrants to purchase up to 14,285,715 shares of its common stock (or pre-funded warrants in lieu thereof) at an exercise price of $1.75 per share of common stock, at a combined public offering price of $1.75 per share of common stock and accompanying Series A and Series B warrants. Inovio reaped approximately $22.4 million in net proceeds from the July 2025 Offering, after deducting underwriting discounts and commissions and offering expenses paid and payable by the Company.

105.    On August 12, 2025, Inovio issued a press release reporting its financial results and recent business highlights for Q2 2025. The press release touted the Company's preparedness to submit the INO-3107 BLA to the FDA with information sufficient to warrant the agency's accelerated approval or priority review, stating, *inter alia*:

INOVIO completed the DV [design verification] testing for the CELLECTRA 5PSP device and requested in July 2025 that the FDA allow it to begin submitting its BLA on a rolling basis based on the Breakthrough Therapy designation previously granted to INO-3107. INOVIO anticipates completing its submission over the next several months and requesting a priority review. FDA inspection of INOVIO as clinical sponsor of the Phase 1/2 trial was successfully completed. The company is working on the device-related sections for its BLA and updating its active IND [Investigational New Drug application] so it can begin enrolling patients into its placebo-controlled, randomized confirmatory trial, which will include 100 patients and be conducted at approximately 20 sites across the United States.

Data from a retrospective study (RRP-002) investigating the long-term clinical efficacy of patients treated with INO-3107 have been published in a peer-reviewed journal, The Laryngoscope. The data demonstrate that INO-3107 provided significant clinical benefit to RRP patients, as measured by reduction in surgery, that continued to improve in years two and three following initial treatment.

106.    The same day, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2025 (the "Q2 2025 10 Q"). The Q2 2025 10-Q contained substantively the same generic, boilerplate provisions as referenced herein, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "*if*" certain conditions occurred, while simultaneously downplaying the same.

107.    Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced herein, *supra*, signed by the Individual Defendants.

108.    On August 26, 2025, Inovio issued a press release "announc[ing] that the FDA has notified INOVIO that it agrees with its rolling submission timeline for the BLA for INO-3107 as a treatment for adults with [RRP]" and that the Company "anticipates completing its submission to the FDA in the coming months and requesting priority review, with the goal of file acceptance by the FDA by the end of 2025." The press release also quoted Defendant Shea as touting the INO-3107 BLA's prospects for FDA accelerated approval and/or priority review:

We are pleased the FDA agreed to our rolling submission plan. ***We are also encouraged by their recent activity in recognizing the importance of accelerating the full approval of new technologies that can bring life-changing therapeutic options to patients suffering from rare diseases such as RRP . . . . Based on the totality of our data, we believe INO-3107 has the potential to become the preferred product for the treatment of RRP by patients and providers***. We are leveraging our Breakthrough Therapy designation for INO-3107 to continue discussions with the FDA on the pathway to approval as we aim to bring our positively differentiated therapeutic option to patients as quickly as possible.

109.    On November 3, 2025, Inovio issued a press release announcing that it had completed its rolling submission of the INO-3107 BLA, seeking accelerated approval. The press release stated, in relevant part:

- *[RRP] is a rare HPV-related disease of the respiratory tract with significant unmet need*
- *INO-3107 previously received Orphan Drug and Breakthrough Therapy designations; BLA submitted under FDA's Accelerated Approval program*
- *Expect to receive file acceptance by year end 2025 with potential PDUFA date in mid-2026 if request for priority review granted*

\*    \*    \*

INOVIO submitted the BLA under the FDA's Accelerated Approval program and has requested a priority review, which if granted, is expected to be completed within six months following the 60-day filing period. If approved, INO-3107 would be INOVIO's first commercial product and the first DNA medicine available in the United States.

(Emphases in original.)

110.    On November 10, 2025, Inovio issued a press release reporting its financial results and recent business highlights for Q3 2025. The press release reiterated that Inovio had "submitted the BLA under the FDA's accelerated approval program and has requested a priority review, which if granted, is expected to be completed within six months following file acceptance." The press release also quoted Defendant Shea as stating, in relevant part:

I'm very pleased to report that we've completed the rolling submission of our BLA for lead candidate INO-3107. We believe every patient deserves a treatment that reduces exposure to surgery and ***INO-3107 has the potential to meet that***

*significant need in the RRP community.* The majority of patients in our Phase 1/2 trial needed fewer surgeries after treatment and showed continued improvement through Year 2 *without additional doses, and without surgical interventions during the treatment window to maintain minimal residual disease as required by other treatment modalities[.]*

111.    The same day, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2025 (the "Q3 2025 10-Q"). The Q3 2025 10-Q touted the Company's submission of the INO-3107 BLA for priority review, while simultaneously touting the strength of INO-3107's clinical results, stating, in relevant part:

> Utilizing our breakthrough therapy designation, we requested rolling submission of our [INO-3107] BLA in July 2025 and reported in November 2025 that we had completed the BLA submission, with the goal of receiving file acceptance by the FDA by the end of 2025. We have requested a priority review from the FDA, which, if granted, is expected to be completed within six months following the 60-day filing period.

> During 2025, we have presented key data regarding INO-3107 at several scientific conferences. Highlights from the data include:

> - 81% (26/32) of patients experienced a reduction of one or more surgeries at Year 1 post-treatment

> - By the end of Year 2, 91% (21/23) of evaluable patients continued to experience a reduction of one or more surgeries. Only two patients had not yet responded to treatment with INO-3107

> - INO-3107 demonstrated continued clinical benefit, with a persistent decline in the mean number of surgeries through Year 2 post-therapy: A 78% reduction in mean annual surgeries was seen at Year 2 compared to the 1 year pre-treatment period (0.9, n=28 vs 4.1, n=32)

> - Clinical response was not dependent upon low viral loads, molecular subtype or other elements of the papilloma microenvironment

112.    The Q3 2025 10-Q also contained substantively the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain

conditions occurred, while simultaneously downplaying the same. Appended as exhibits to the Q3 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

113.    Upon information and belief, on or about November 12, 2025, Inovio closed an underwritten public offering (the "November 2025 Offering") of 13,158,000 shares of its common stock at a public offering price of $1.90 per share, reaping approximately $25 million in gross proceeds before underwriting discounts and commissions and offering expenses, and excluding any exercise of the underwriters' option to purchase additional shares of common stock.

114.    The statements referenced herein above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to fully disclose that: (i) Inovio had insufficient information to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) accordingly, INO-3107's overall regulatory and commercial prospects were overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

115.    In addition, Defendants violated Item 303, which required Inovio to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' continued failure to disclose, inter alia, that they lacked sufficient data to support the INO-3107 BLA's accelerated approval or priority review by the FDA violated Item 303 because

these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## The Truth is Fully Revealed

116.    On December 29, 2025, during pre-market hours, Inovio issued a press release announcing that the FDA had accepted the INO-3107 BLA on a standard rather than accelerated review timeline (the "December 2025 Press Release"). Defendants advised that the FDA had indicated that the Company did not submit adequate information to justify eligibility for accelerated approval. Defendants further advised that Inovio did not plan to seek approval under the standard review timeline and would request a meeting with the FDA to discuss how it may still pursue accelerated approval. Specifically, the press release stated, in relevant part:

> [T]he [FDA] accepted the company's [BLA] for INO-3107 for review as a potential treatment for adults with RRP. ***The review classification designated by FDA is Standard.***
>
> ***The FDA assigned INO-3107 a Prescription Drug User Fee Act (PDUFA) review goal date of October 30, 2026***, which is the date by which it intends to take action on the application. The FDA has indicated that it is not currently planning to hold an advisory committee meeting to discuss this application.
>
> ***INOVIO filed its BLA under the accelerated approval pathway. In the file acceptance letter, the FDA noted as a potential review issue its preliminary conclusion that the company has not submitted adequate information to justify eligibility for the accelerated approval pathway***. INOVIO continues to believe that INO-3107 provides a meaningful therapeutic benefit over existing treatments and fulfills the criteria for accelerated approval. INOVIO plans to request a meeting with FDA to discuss next steps to remain eligible under the accelerated approval program. INOVIO is not currently planning to seek approval for INO-3107 under the traditional pathway.

117.    The foregoing disclosures shocked the market. For example, that same day, not long after markets opened, *Bloomberg* published an article entitled "Inovio Falls as FDA Questions Drug's Accelerated Path Potential[,]" reporting that Inovio's shares "s[u]nk as much as 23%, [the] most intraday since July 3, after the FDA questioned the eligibility of its

experimental treatment for adults with [RRP] for an accelerated approval." Likewise, investor news outlets *Seeking Alpha* and *Benzinga* published articles within a few hours of the market opening, entitled "Inovio drops as respiratory papillomatosis asset denied accelerated review" and "Inovio Stock Sinks As FDA Pushes Back On Accelerated Approval For Rare Disease Drug[,]" respectively, with each noting that Inovio's stock price had cratered following the December 2025 Press Release's disclosures.

118.   Also on December 29, 2025, H.C. Wainwright issued a note addressing Inovio, observing that the INO-3107 BLA's "***accelerated review pathway [is] in dispute***" and that, "[o]f note, [the] FDA has designated the review classification as standard with a PDUFA goal date of October 30, 2026" because "the company has not submitted adequate information to justify eligibility for the accelerated approval pathway" (emphasis in original). The following day, Jefferies, too, commented on the December 2025 Press Release's disclosures, observing that Inovio's "[s]tock was down ~20% following AA [accelerated approval] overhang in BLA acceptance with the standard review PDUFA date vs. [Inovio's] tight cash runway[,]" and that "if AA is not supportive, [the] program could be further delayed after Ph[ase] 3 results."

119.   Ultimately, following the December 2025 Press Release, Inovio's stock price fell $0.56 per share, or 24.45%, to close at $1.73 per share on December 29, 2025.

120.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other shareholders have suffered significant losses and damages.

### False and Misleading Inovio Proxy Statements

*The 2024 Proxy Statement*

121.    On April 11, 2024, the Company filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth solicited proxies to vote at the annual stockholder meeting via the 2024 Proxy Statement.

122.    The 2024 Proxy Statement asked Inovio stockholders to vote to re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board and approve, on an advisory basis, the compensation of the Company's named executive officers.

123.    With respect to the "Board['s] Role in Risk Management," the 2024 Proxy Statement provided the following:

> The risk oversight function of our Board is carried out by both the Board and the Audit Committee. Management prepares and presents an annual business plan to the Board, which identifies risks associated with our operations and is reviewed quarterly by the Board. As provided in its charter, the Audit Committee meets periodically with management to discuss major financial and operating risk exposures and the steps, guidelines and policies taken or implemented related to risk assessment and risk management. Matters of strategic risk are considered by our Board. Each quarter management reports to the Audit Committee on legal, finance, accounting and tax matters. Our Board is provided with reports on legal matters at least quarterly and on other matters related to risk oversight on an as needed basis.

124.    With respect to the Company's Code of Conduct, the 2024 Proxy Statement provided the following:

> We have adopted a Code of Business Conduct and Ethics, which applies to all directors, officers and employees, including the principal executive officer, principal financial and accounting officer and controller. The purpose of the Code is to promote honest and ethical conduct. The Code of Business Conduct and Ethics is available on our website and is also available in print, without charge, upon written request to our corporate secretary at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. Any amendments to or waivers of the Code will be promptly posted on our website at www.inovio.com or in a report on Form 8-K, as required by applicable laws.

125.    With respect to the Audit Committee, the 2024 Proxy Statement provided the following, in relevant part:

> The functions of the Audit Committee include retaining our independent registered public accounting firm, reviewing its independence, reviewing and approving the planned scope of our annual audit, reviewing and approving any fee arrangements with our independent registered public accounting firm, overseeing its audit work, reviewing and pre-approving any non-audit services that may be performed by it, reviewing the adequacy of accounting and financial controls, reviewing our critical accounting policies and reviewing and approving any related party transactions. The Audit Committee acts pursuant to a written charter that is available on our corporate website at: http://www.inovio.com.

126.    The 2024 Proxy Statement was materially misleading as it failed to disclose that: (i) although Inovio claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants were actively violating the Code of Conduct at the time; (ii) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Inovio to issue false and misleading statements; and (iii) the Individual Defendants allowed Defendants Shea and Kies to sell stock at artificially inflated prices while in possession of material nonpublic information.

127.    Further, the 2024 Proxy Statement failed to disclose that: (i) the Company lacked a sufficient basis to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) Defendants knew the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (iii) INO-3107's financial prospects were greatly exaggerated; (iv) as a result, the Company's overall financial assertions were inaccurate; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis at all relevant times.

*The 2025 Proxy Statement*

128.    On April 7, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "2025 Proxy Statement"). Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth solicited proxies to vote at the annual stockholder meeting via the 2025 Proxy Statement.

129.    The 2025 Proxy Statement asked Inovio stockholders to vote to: (i) re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board; (ii) approve, on an advisory basis, the compensation of the Company's named executive officers; and (iii) approve an amendment and restatement to the Company's 2023 Omnibus Incentive Plan (the "2025 Amendment of the 2023 Omnibus Incentive Plan").

130.    The 2025 Proxy Statement told investors that the 2025 Amendment of the 2023 Omnibus Incentive Plan would, among other things, increase the aggregate number of shares of common stock available for grant by 2,200,000 shares and extend the term during which incentive stock options may be granted to February 27, 2035. The 2025 Proxy Statement stated that, as of March 24, 2025, 24,460 shares of common stock were still available for grant, meaning that if the 2025 Amendment of the 2023 Omnibus Incentive Plan were approved, the Company would have approximately 2,224,460 shares available for grant. The 2025 Proxy Statement stated that "[a]ll of our (including our affiliates)" employees, non-employee directors and consultants are eligible to participate" in the 2025 Amendment to the 2023 Omnibus Incentive Plan. The 2025 Proxy Statement state4 that if the 2025 Amendment of the 2023 Omnibus Incentive Plan is not approved, the Company's incentive plan would continue to be administered in its current form.

131. With respect to the "Board['s] Role in Risk Management[,]" the 2025 Proxy Statement provided the following:

> The risk oversight function of our Board is carried out by both the Board and the Audit Committee. Management prepares and presents an annual business plan to the Board, which identifies risks associated with our operations and is reviewed quarterly by the Board. As provided in its charter, the Audit Committee meets periodically with management to discuss major financial and operating risk exposures and the steps, guidelines and policies taken or implemented related to risk assessment and risk management. Matters of strategic risk are considered by our Board. Each quarter management reports to the Audit Committee on legal, finance, accounting and tax matters. Our Board is provided with reports on legal matters at least quarterly and on other matters related to risk oversight on an as needed basis.

132. With respect to the Company's Code of Conduct, the 2025 Proxy Statement provided the following:

> We have adopted a Code of Business Conduct and Ethics, which applies to all directors, officers and employees, including the principal executive officer, principal financial and accounting officer and controller. The purpose of the Code is to promote honest and ethical conduct. The Code of Business Conduct and Ethics is available on our website and is also available in print, without charge, upon written request to our corporate secretary at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. Any amendments to or waivers of the Code of Business Conduct and Ethics will be promptly posted on our website at www.inovio.com or in a report on Form 8-K, as required by applicable laws.

133. With respect to the Audit Committee, the 2025 Proxy Statement provided the following, in relevant part:

> The functions of the Audit Committee include retaining our independent registered public accounting firm, reviewing its independence, reviewing and approving the planned scope of our annual audit, reviewing and approving any fee arrangements with our independent registered public accounting firm, overseeing its audit work, reviewing and pre-approving any non-audit services that may be performed by it, reviewing the adequacy of accounting and financial controls, reviewing our critical accounting policies and reviewing and approving any related party transactions. The Audit Committee acts pursuant to a written charter that is available on our corporate website at: http://www.inovio.com.

134.     The 2025 Proxy Statement was materially misleading because it failed to disclose that: (i) although Inovio claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants were actively violating the Code of Conduct at the time; (ii) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Inovio to issue false and misleading statements; and (iii) the Individual Defendants allowed Defendants Shea and Kies to sell stock at artificially inflated prices while in possession of material nonpublic information.

135.     Further, the 2025 Proxy Statement failed to disclose that: (i) the Company lacked a sufficient basis to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) Defendants knew the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (iii) INO-3107's financial prospects were greatly exaggerated; (iv) as a result, the Company's overall financial assertions were inaccurate; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis at all relevant times.

**DAMAGES TO THE COMPANY**

136.     Inovio has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, Inovio has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

      a.  costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

      b.  substantial loss of market capital;

c.  costs already incurred and to be incurred defending the Related Securities Action; and

d.  any fines or other liability resulting from the Company's violations of federal law.

137.   In addition, Inovio's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

138.   The wrongdoing complained of herein has irreparably damaged Inovio's corporate image and goodwill. For at least the foreseeable future, Inovio will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Inovio's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

139.   Plaintiff brings this action derivatively in the right and for the benefit of Inovio to redress injuries suffered, and to be suffered, by Inovio as a direct result of violations of federal securities laws by the Defendants. Inovio is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

140.   The Board of Inovio, at the time this action was commenced, consisted of Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno and Zoth, a total of eight (8) individuals.

141.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Inovio Board would be futile, and therefore, excused. This is because a

majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

142.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

143.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Shea Because Her
Principal Professional Occupation as the Company's CEO and President**

144.    Defendant Shea has been with the Company as President and CEO since 2022. Defendant Shea is also a member of the Board. As the CEO of the Company, it is reasonable to infer that, due to the importance of accelerated FDA approval and/or priority review for the BLA for INO-3107 for the treatment of RRP, Defendant Shea would have been aware of the fact that: (i) manufacturing for Inovio's CELLECTRA device was deficient; (ii) accordingly, Inovio was unlikely to submit the INO-3107 BLA to the FDA by the second half of 2024; (iii) Inovio had insufficient information to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (iv) accordingly, INO-3107's overall regulatory and commercial prospects were overstated. In her role as CEO of the Company for the fiscal year of 2025, Defendant Shea

received $1,587,155 in total compensation. The Company does not claim that Defendant Shea is an independent director and because her primary source of income and primary employment is her employment as President and CEO of Inovio and her professional reputation is inextricably bound to her role at Inovio, Defendant Shea is incapable of acting independently and demand is futile upon her.

**Demand is Futile as to Defendant Weiner Because of his**
**Previous Position as Chair of the Company's Scientific Advisory Board**

145.    Demand is futile as to Defendant Weiner because he is not an independent director. As disclosed by the Company in the 2025 Proxy Statement, Defendant Weiner is not independent because he previously served as the Chair of the Company's Scientific Advisory Board. In his role as Chair of the Scientific Advisory Board, Defendant Weiner was paid over $120,000 annually, including stock awards beyond those granted to him for his role as a director. The Company does not claim that Defendant Weiner is independent, and due to his former role as Chair of Inovio's Scientific Advisory Board, Defendant Weiner is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Audit Committee Defendants**

146.    Demand is futile as to Defendants Benito, Shepard, and Zoth (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

147.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties of the Audit Committee are set forth herein, *supra*.

148.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the

Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

149.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the fact that: (i) manufacturing for Inovio's CELLECTRA device was deficient; (ii) accordingly, Inovio was unlikely to submit the INO-3107 BLA to the FDA by the second half of 2024; (iii) Inovio had insufficient information to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (iv) accordingly, INO-3107's overall regulatory and commercial prospects were overstated. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

### Demand is Futile as to the Director Defendants

150.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

151.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's

business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

152.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

153.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

### Against the Individual Defendants for
### Violations of Section 14(a) of the Exchange Act

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

156.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that

no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

157. Under the direction and watch of the Individual Defendants, the 2024 and 2025 Proxy Statements failed to disclose that: (i) manufacturing for Inovio's CELLECTRA device was deficient; (ii) accordingly, Inovio was unlikely to submit the INO-3107 BLA to the FDA by the second half of 2024; (iii) Inovio had insufficient information to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (iv) accordingly, INO-3107's overall regulatory and commercial prospects were overstated.

158. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 and 2025 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2024 and 2025 Proxy Statements, including but not limited to, the re-election of the directors.

159. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 and 2025 Proxy Statements.

160. Plaintiff on behalf of Inovio has no adequate remedy at law.

## COUNT II

**Against the Securities Action Defendants for
Contribution Under Section 10(b) of the Exchange Act,
Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

161. Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

162.   As a result of the conduct and events alleged above, Inovio has been named as a defendant in the Related Securities Action brought on behalf of Inovio shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

163.   Federal law provides Inovio with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Inovio has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Inovio to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

164.   Accordingly, Plaintiff, on behalf of Inovio, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Inovio under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Inovio.

165.   Inovio claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

166.   Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects.

These statements were materially misleading to persons who purchased Inovio securities during the Relevant Period.

167.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Inovio securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

168.    The damages suffered by said investors were caused by reason of the fact that: (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

169.    The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

170.    When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Inovio, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

171.    Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Inovio were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on

behalf of Inovio.

**Allegations Regarding the Securities Action Defendants as Control Persons**

172.    In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Inovio in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

173.    The Securities Action Defendants were "controlling persons" of Inovio within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

174.    Plaintiff hereby derivatively claims such right of contribution on behalf of Inovio.

**COUNT III**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    The Individual Defendants owed and owe Inovio fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Inovio the highest obligation of good faith, loyalty, and due care.

177.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Inovio shareholders materially misleading and inaccurate information through the Company's SEC

filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

178.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Inovio to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Inovio and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

179.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## COUNT IV

### Against all the Individual Defendants for Unjust Enrichment

181.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

182.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Inovio.

183.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Inovio.

184.    Plaintiff, as a shareholder and representative of Inovio, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and

other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

185. Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Abuse of Control

186. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

187. The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Inovio and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

188. As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

189. Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT VI

### Against the Individual Defendants for Gross Mismanagement

190. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191. The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were

responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

192. Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

193. By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Inovio's affairs and in the use and preservation of Inovio's assets.

194. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Inovio to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Inovio, thus breaching their duties to the Company.

195. As a result, the Individual Defendants grossly mismanaged Inovio and should be liable to the Company for the resulting damages.

## COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

196. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

197. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by

the Related Securities Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

198.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

199.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Inovio and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Inovio the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Inovio and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inovio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2)    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.    Determining and awarding to Inovio exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.    Awarding Inovio restitution from Defendants, and each of them;

F.    Awarding Inovio Contribution from Securities Action Defendants, and each of them;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 22, 2026

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Tel: (302) 803-4600
rernst@bk-legal.com

OF COUNSEL:
Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, NY 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*